# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

FILED

FEB 28 2018

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                      DEPUTY

In the Matter of the Search of  )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )    Case No.
)
Black Alcatel oneTouch cellular telephone )
IMEI 014499002092698  )       **18MJ0955**
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Attachment A, incorporated fully herein.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

Attachment B, incorporated fully herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 USC 841(a)(1), 846 | Distribution of Controlled Substances and Conspiracy |

The application is based on these facts:

See attached affidavit, incorporated fully herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Ava Moran, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/27/18

*Judge's signature*

City and state: San Diego, CA          Mitchell D. Dembin, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Ava A Moran, being duly sworn, declare and state:

## TRAINING AND EXPERTISE

1. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2. I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and have been so employed since August 2014. I am currently assigned to the San Diego Field Division, North County Regional Gang Task Force ("NCRGTF"). Prior to joining the FBI, I was a United States Marine Corps Intelligence Officer serving on active duty from August 2009 until September 2013. I have received 21 weeks of training at the FBI Academy in Quantico, Virginia. During that training, I received instruction regarding a wide variety of investigative techniques that are commonly used in support of a wide range of the FBI's investigative priorities. The training included instruction regarding the use of sources, electronic surveillance techniques, law enforcement tactics, search and seizure laws and techniques, surveillance, forensic techniques, interviewing, and a variety of other subjects.

3. During my law enforcement career, I have received formal training in narcotics and gang investigations. I have participated in multiple separate investigations involving the distribution of controlled substances and firearms. As part of these investigations, I have used various investigative techniques, including physical and stationary surveillance, informants and cooperating sources, court authorized interceptions, pen register/trap and trace devices, telephone toll analysis, undercover operations, physical searches, mail covers, and electronic examinations of evidence. In addition to my formal training, I have received on the job training in the manner in which narcotics are packaged, consumed, transported and sold. I have spoken to narcotics officers, drug users, drug dealers, and informants regarding the manner in which narcotics transactions are commonly carried out, how narcotics are packaged for sale, and how drug dealers store, conceal, sell, smuggle, and

transport narcotics. Through previous investigations, I have obtained knowledge regarding the ordinary meaning of controlled substance slang and jargon. I have monitored and reviewed hundreds of recorded telephone calls and text messages pursuant to Title III court orders in narcotics and gang-related investigations, as well as handled confidential sources with access to drug dealers and gang members.

4. Based on my training and experience, I am familiar with how drug traffickers and gang members communicate and operate. For example, I am aware that drug traffickers and gang members frequently discuss criminal activity using cellular telephones and often use coded language to obscure these conversations. I also know that drug traffickers and gang members change phones as a means to evade detection by law enforcement. Moreover, I know that drug traffickers and gang members obtain phones from third parties and or subscribe to them in fictitious names in order to mask the true identity of the individuals using the phones. I am also aware of how drug traffickers and gang members organize and operate their illegal activities, including the use of locations, vehicles, and other resources, in the furtherance of their criminal activities. I am familiar with the typical make up and operation of gangs and drug trafficking organizations, including the distribution, storage, and transportation of the drugs, the collection of money which represents the proceeds of drug trafficking and other criminal activity, and money laundering.

5. The following is based my own investigation, oral and written reports by other law enforcement officers, physical surveillances, interviews, database and public records checks, searches, telephone toll analysis, and other investigation. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to establish foundation for the requested order. Conversations and discussions below are set forth in substance unless noted. I have included in parentheses or in brackets my explanations of coded or veiled speech, based on my training and experience, as well as my familiarity with the facts of this investigation. Dates and times are approximate.

//

2

**REQUESTED SEARCH WARRANT**

6. I submit that the facts contained herein demonstrate probable cause to believe that the fruits, instrumentalities and evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Conspiracy to Distribute Controlled Substances) and Title 21, United States Code, Section 841(a)(1) (Distribution of Controlled Substances) will be found in the below listed items to be searched as more fully described in Attachment A, incorporated herein:

    a. Black Alcatel oneTouch cellular telephone, IMEI 014499002092698 (**Target Telephone**).

The **Target Telephone** was seized on August 17, 2017, by the North County Gang Task Force during the execution of a search warrant at 1924 College Boulevard, Apartment 283, Oceanside, CA. The **Target Telephone** is currently in FBI custody. The evidence to be seized from the **Target Telephone**, as Title 21, United States Code, Sections 841(a)(1) and 846 (Conspiracy to Distribute Controlled Substances) and Title 21, United States Code, Section 841(a)(1) (Distribution of Controlled Substances), is more fully described in Attachment B, incorporated herein.

**FACTS ESTABLISHING PROBABLE CAUSE**

**Background of the Investigation**

7. Since the fall of 2016, NCRGTF has been investigating the Varrio Posole Locos (VPLS), Varrio Carlsbad Locos (VCLS), Varrio Mesa Locos (VMLS), and other gang members and associates involved in drug trafficking activities throughout San Diego County, as well as their affiliation with the Mexican Mafia. VPLS has been active in Oceanside since the early 1960s. Currently, there are approximately 163 documented VPLS gang members. VPLS claims a neighborhood in Oceanside that is bordered by Interstate 5 to the west, Mission Avenue to the south, and Canyon Drive to the east. VCLS has been active in Carlsbad since the early 1970s. Currently, VCLS has approximately 78 documented VCLS members. VCLS claims a neighborhood in Carlsbad that is bordered by Interstate 5 to the east, Santa Fe Railroad Tracks to the West, Carlsbad Village Drive to the North, and

1  Tamarack Avenue to the South. VMLS has been active in Oceanside since the 1970s.
2  Currently, VMLS has approximately 59 documented members. The VMLS street gang claims
3  as turf or territory the area of Oceanside known as the Mesa Margarita/Libby Lake
4  Neighborhood. This area is located to the south of Libby Lake Park and to the north of North
5  River Road. The territory is bordered to the west by Calle Montecito and to the east by Calle
6  Vallecito. VPLS, VCLS, and VMLS gang members and associates are involved in a variety
7  of criminal activity, including drug distribution, firearms trafficking, robberies, vehicle
8  thefts, burglaries, assaults, and homicide. Additionally, VPLS, VCLS, and VMLS gang
9  members and associates have had historic ties to the Mexican Mafia.

10     8.     The investigation was initiated in September 2016 after two documented VPLS
11  members were murdered in VPLS territory. The first homicide was a robbery gone awry and
12  the second was committed by members of a rival gang known as the Center Street Locos
13  (CST). VPLS members conducted a retaliatory shooting against CST, which resulted in
14  serious bodily injury of a bystander. Anticipating additional violence, members of NCRGTF
15  began tasking their respective confidential sources (CS) to obtain information on VPLS and
16  their illegal activities. Early in the investigation, agents identified Benjamin MARTINEZ as
17  a documented VPLS member and ounce quantity methamphetamine dealer living in
18  Oceanside who was regularly communicating with members of VPLS, Vista Homeboys
19  (VHB), and other Hispanic gang members and associates in North County. Through the
20  investigation of MARTINEZ, agents learned of several other methamphetamine dealers in
21  North County who were VPLS and VCLS members or associates.

22     9.     Since approximately May 2017, investigators turned to investigating VPLS and
23  VCLS members involved in a heroin distribution network in the Oceanside area of North
24  County. Through the investigation, investigators identified VCLS member Robert
25  GONZALEZ, aka "Sleepy," who was operating a robust heroin distribution network in
26  Oceanside, which included several other street gang members who collected money for
27  GONZALEZ or distributed heroin on GONZALEZ's behalf. From June 30, 2017, to October
28  4, 2017, investigators obtained authorization to intercept wire and electronic

4

communications on three telephones belonging to GONZALEZ, a telephone belonging to VPLS member Martin RODRIGUEZ, aka "Osama," and a telephone belonging to VCLS member Sergio CARO, aka "Soldier." Over the intercepts, investigators confirmed that GONZALEZ was a significant supplier of heroin in Oceanside. GONZALEZ sold narcotics every single day of the roughly three-month wiretap on his telephones. During the wiretap intercepts, GONZALEZ and his customers would often refer to the heroin as "negra" or "taco" or "media," and the prices as "BBQ money" or "feria" or as "4" or "3" for $400 or $300 dollars-worth of heroin. GONZALEZ served approximately five to 10 customers per day during the three month period, in amounts ranging from a half gram to 12 grams of heroin.[1] Based on the intercepts, investigators learned that RODRIGUEZ ordered heroin from GONZALEZ and then re-distributed that heroin to his customers. Investigators further learned, based on the intercepts over GONZALEZ's and CARO's telephones, that CARO was collecting drug debt on behalf of GONZALEZ, as well as distributing narcotics. Through all of the intercepts and surveillance in this investigation, investigators determined that GONZALEZ used Luis CAMPOS, aka "Monster," and Daniel SANTIAGO-Martinez, aka "Tiny," to deliver drugs to his customers and bring back drug money. Investigators also learned that, in addition to RODRIGUEZ and CARO, GONZALEZ worked with Raul LOPEZ, aka "Lalo" or "Speedy," Francisco ARZOLA, aka "Spanky," Irma URENA, and Mario ALCANTAR to distribute narcotics in Oceanside. GONZALEZ resided in VPLS territory and worked with the above-named co-conspirators and others to distribute heroin primarily in that territory. The territory is located off the I-5 freeway and Highway 76 in Oceanside. Based on intercepts and surveillance, GONZALEZ typically met his customers and sub-distributors in the

---

[1] Although some methamphetamine was seized from GONZALEZ during the investigation, investigators believe GONZALEZ was primarily a heroin distributor. In addition, his sub-distributors are primarily known to investigators to be heroin distributors as well. Moreover, the prices discussed on the wiretap are largely consistent with the going rate for heroin, not methamphetamine.

parking lots of Wal-Mart, Harbor Freight, Mission Donuts, Burger King, El Super, and a methadone clinic (Mission Treatment Service) in Oceanside.



**RODRIGUEZ and the Target Telephone**

10. Investigators learned about RODRIGUEZ when he was intercepted on GONZALEZ's telephones and surveilled conducting drug transactions with GONZALEZ. Investigators also obtained authorization to intercept wire and electronic communications for RODRIGUEZ's telephone (TT4: a T-Mobile cellular telephone bearing the number (442) 264-4625) during the month of August 2017. Interceptions occurred from August 8, 2017, to August 17, 2017.[2] Based on the intercepts, investigators learned that RODRIGUEZ ordered approximately 6-12 grams of heroin from GONZALEZ every 1-3 days. Through surveillance and the intercepts on RODRIGUEZ's telephone, investigators confirmed RODRIGUEZ was re-selling the heroin bought from GONZALEZ on a daily basis.

---

[2] Interceptions were terminated early because RODRIGUEZ entered state custody on unrelated charges.

6

11. For example, on July 4, 2017, RODRIGUEZ texted GONZALEZ, "Its Osama. R u going to be around because I'm almost done [almost finished selling]," directly followed by "3 shy from finishing [3 grams shy from selling out]." Later that day, RODRIGUEZ texted GONZALEZ and ordered a "12pk [12 grams of heroin]." Similarly, on July 9, 2017, and July 11, 2017, RODRIGUEZ asked GONZALEZ for a "big pack," which, based on my experience and the investigation, is likely 6 grams or a quarter ounce.

12. On July 13, 2017, at 8:58 a.m., GONZALEZ received a text message from RODRIGUEZ, which read, "Can I see u." At approximately 9:50 a.m., RODRIGUEZ, placed a call to GONZALEZ. During the call, RODRIGUEZ asked GONZALEZ, "Hey, can I meet up with you?" GONZALEZ then told RODRIGUEZ, "…what time is it right now, I'm going to go to the clinic [methadone clinic]…I'm going to be there again, twenty minutes…." At approximately 11:24 a.m., RODRIGUEZ placed another call to GONZALEZ. During the call, RODRIGUEZ said, "Hey, I'm…I'm right here," and GONZALEZ responded, "Ok I'm headed there right now." Following these calls and text messages, surveillance agents observed RODRIGUEZ and GONZALEZ meet in the Taco Bell parking lot in Oceanside. Directly after the meeting, surveillance agents observed RODRIGUEZ packaging a bindle and then walking the bindle to an unknown individual in a green van. It is believed RODRIGUEZ was repackaging the narcotics he had just purchased from GONZALEZ in order to redistribute them to an unidentified customer.

13. On July 25, 2017, at approximately 1:20 p.m., GONZALEZ received an incoming call on from RODRIGUEZ. During the call, RODRIGUEZ asked GONZALEZ, "Hey can I meet with you?" GONZALEZ affirmed and then asked, "Hey…what [how much narcotics] do you want?" RODRIGUEZ answered, "Yea I think ah ah ah 6 pack [six grams]." At approximately 6:09 p.m. that evening, GONZALEZ texted RODRIGUEZ, "go to I door 10 min," and RODRIGEUZ responded, "I don't got a ride," followed by another text from RODRIGUEZ which read, "Can you come this way to Albertsons." At approximately 8:45 p.m., GONZALEZ texted RODRIGUEZ, "you ready I'm com8ing from San Marcos 15 min at

Albertsons cool." Based on this conversation, it is believed GONZALEZ and RODRIGUEZ were coordinating to conduct a narcotics transaction for 6 grams of heroin.

14. On August 9, 2017, at approximately 6:57 p.m., RODRIGUEZ received a text from an unknown male (UM1), which read "Bro I have 60 can you do a g [gram of narcotics]," to which RODRIGUEZ responded, "No/ I can't do it." The UM1 then texted, "Can you do a half," to which RODRIGUEZ responded, "Yes." At approximately 7:04 p.m., UM1 texted RODRIGUEZ, "Cool ill see you at the same spot in 4 minutes ok" and RODRIGUEZ responded, "Simon [yes]." Similarly, on August 16, 2017, RODRIGUEZ received a call from an unknown male (UM2). At the beginning of the call, RODRIGUEZ and UM2 greeted each other and the UM2 asked RODRIGUEZ, "...you gonna re-up [resupply narcotics] today or what?" RODRIGUEZ responded "Huh?" and UM2 reiterated, "You gonna re-up today or you already did?" RODRIGUEZ responded, "...I already did...I still got some [narcotics]...." The UM2 then said, "I was gonna go get a hundred...maybe a little three pack [3 grams]...." The UM2 then told RODRIGUEZ he was on his way over and the call ended. Based this conversation, it is believed RODRIGUEZ was expressing that he was in possession of narcotics and agreed to sell UM2 approximately one hundred dollars' worth of said narcotics.

15. On August 17, 2017, the day interceptions ceased on RODRIGUEZ's telephone, investigators executed a state search warrant at 1924 College Boulevard, Apartment 283, Oceanside.[3] In addition to RODRIGUEZ, four other individuals were present in the apartment. One female stated she resided in a drug treatment center, but the apartment was leased to her. That same female stated RODRIGUEZ and another female lived at the apartment at the time.

16. During the search, investigators bypassed the living room of the apartment and contacted RODRIGUEZ in the master bedroom. While being detained, RODRIGUEZ spontaneously stated, "It's all mine." When asked if there was anything illegal in the

---

[3] In August 2017, investigators had surveilled RODRIGUEZ coming and going from this apartment and selling narcotics to customers from this apartment. Based on recent surveillance, RODRIGUEZ is now believed to reside at 1435 Dubuque Street, Oceanside, with his family.

apartment, RODRIGUEZ said he had some syringes and a "dub of heroin" in his room. During a search of RODRIGUEZ's bedroom (the master bedroom), investigators located a digital scale, three syringes on the bedroom floor, two empty plastic bindles, a small ball of a black tar-like substance, and a syringe containing a black tar-like substance in the toilet of the master bathroom. The net weight of the substance in the small ball was 0.4 grams. Investigators also found a box next to the bed, which contained a notebook with writing consistent with a pay and owe ledger for narcotics transactions. Finally, investigators found and seized the **Target Telephone**, which was located in the living room. RODRIGUEZ claimed the **Target Telephone** to be his.

17. Based on the intercepts discussed above, I believe RODRIGUEZ used a telephone to engage in narcotics transactions. Moreover, based on RODRIGUEZ's statement, "It's all mine," I believe the **Target Telephone** may have been used by RODRIGUEZ to conduct narcotics transaction. Based on my training and experience, as well as this investigation, I also know that drug dealers, including RODRIGUEZ, utilize cellular communications to arrange narcotics transactions wherein they discuss meet locations, prices, and quantities. Therefore, I believe that further evidence of RODRIGUEZ's drug distribution activities will be found on the **Target Telephone**.

## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

18. Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all facts and opinions set forth in this affidavit, I know that:

   a. Individuals involved in drug distribution use cellular telephones and electronic communication devices to conduct their criminal activities. An examination of the above-referenced items to be searched will enable investigators to establish further evidence of the drug distribution conspiracy. Cellular telephones and electronic communication devices are capable of storing many different types of data that are invaluable to investigators and could be evidence of criminal conduct. This data, sought pursuant to the requested search warrants, consists of the contents of the cell phone or electronic

9

communication device's memory, including: Stored names and telephone numbers in the memory, "phonebook" or list of contacts, and/or speed dial functions of the phones; phone numbers dialed for the most recent outgoing or "sent" calls of the telephones, along with date and time of call data; phone numbers dialing the telephones for the most recent incoming "received" calls, along with date and time of the call data; phone numbers dialing the telephones for the most recent "missed" calls, along with date and time of call data; GPS navigation information; internet searches and websites viewed; and deleted data.

   b. Drug traffickers commonly use cellular telephones, blackberries, PDAs, electronic communication devices, other personal handheld electronic devices, and laptop and desktop computers to communicate with, among others, their customers, their suppliers, and other criminal associates and to store phone numbers, text messages, emails, photographs, physical and email addresses, and other information that constitutes evidence of their drug trafficking activities. Drug traffickers also commonly store records of the business of distributing and selling drugs, on cellular phones, computers and computer discs, diskettes, cassettes, tapes, and other forms of digital media. Drug traffickers commonly maintain these items on their person and/or in their residences and vehicles.

   c. In addition to their use of computers and digital media, persons involved in narcotics trafficking, often use mobile phones in furtherance of these activities. When used in this manner, the mobile phones typically contain data constituting evidence of these activities. Many current mobile phones are sophisticated computing devices and are capable of performing many of the same functions as computers. They are commonly used in furtherance of illicit activity in the same manner as computers, as detailed above.

## SEARCH PROTOCOL FOR CELLULAR TELEPHONES AND ELECTRONIC COMMUNICATION DEVICES

19. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as

personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

20. Following the issuance of this warrant, I will collect the **Target Telephone** and subject it to analysis. All forensic analysis of the data contained within the **Target Telephone** and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

21. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

22. Based upon my experience and training, consultation with other law enforcement officers experienced in drug investigations, and all the facts and opinions set

11

forth in this affidavit, I believe that probable cause exists to conclude that the item set forth in Attachment A (incorporated herein by reference), was utilized to facilitate the offense of drug distribution. Furthermore, I believe there is probable cause to believe he **Target Telephone** contains stored data that constitutes evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Conspiracy to Distribute Controlled Substances) and Title 21, United States Code, Section 841(a)(1) (Distribution of Controlled Substances).

19. Therefore, I respectfully request warrants be issued authorizing a search of the items described in Attachment A (incorporated herein) and the seizure of items listed in Attachment B (incorporated herein), using the methodology described above.

20. I swear the foregoing is true and correct to the best of my knowledge and belief.

Ava Moran, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 27 day of February 2018.

The Honorable Mitchell D. Dembin
United States Magistrate Judge

12

## **ATTACHMENT A**

### PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Conspiracy to Distribute Controlled Substances); and Title 21, United States Code, Section 841(a)(1) (Distribution of Controlled Substances), is described below:

> Black Alcatel oneTouch cellular telephone, IMEI 014499002092698 (**Target Telephone**)

Currently in the possession of the San Diego Federal Bureau of Investigation.

## **ATTACHMENT B**

### ITEMS TO BE SEIZED

Authorization to search the **Target Telephone** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Telephone**. The seizure and search of the **Target Telephone** will be conducted in accordance with the protocol delineated in the affidavit submitted in support of the warrants.

The evidence to be seized from the **Target Telephone** will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data, for the period of <u>July 1, 2017 to and including February 27, 2018</u>:

    a.    tending to identify attempts to distribute or possess with the intent to distribute heroin or other controlled substances;

    b.    tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution or possession with intent to distribute heroin or other controlled substances;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the distribution or possession with the intent to distribute heroin or other controlled substances;

    d.    tending to identify travel to or presence at locations involved in the distribution or possession with intent to distribute heroin or other controlled substances, such as meet locations, stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the **Target Telephone**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**which are evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Conspiracy to Distribute Controlled Substances); and Title 21, United States Code, Section 841(a)(1) (Distribution of Controlled Substances).**